[No. B239184. Second Dist., Div. Six. Apr. 23, 2014.]

THE PEOPLE, Plaintiff and Respondent, v.
MATTHEW BRANDON PROCK, Defendant and Appellant.

**[CERTIFIED FOR PARTIAL PUBLICATION[1]]**

---

[1] Pursuant to California Rules of Court, rules 8.1105(b) and 8.1110, the portions of this opinion enclosed within double brackets, [[/]], are not certified for publication.

## COUNSEL

Stephen Greenberg, under appointment by the Court of Appeal, for Defendant and Appellant.

Kamala D. Harris, Attorney General, Dane R. Gillette, Chief Assistant Attorney General, Lance E. Winters, Assistant Attorney General, Scott A. Taryle and Pamela C. Hamanaka, Deputy Attorneys General, for Plaintiff and Respondent.

## OPINION

**YEGAN, J.**—In 2000, Matthew Brandon Prock stabbed Eduardo Vasquez once in the chest, killing him. The jury at appellant's first trial acquitted him of first degree murder but convicted him of second degree murder. (Pen. Code, §§ 187, 189.)[2] We affirmed the conviction. (*People v. Prock* (May 22, 2002, B150248) [nonpub. opn. by Yegan, J., with Gilbert, P. J., and Perren, J., conc.].) The California Supreme Court denied review. In 2007, a federal district court granted appellant's petition for writ of habeas corpus and ordered a new trial after ruling that the trial court prejudicially erred when it instructed the jury that second degree implied-malice murder is a general intent crime. It also ruled that this court's analysis of harmless error was "perfunctory" and "objectively unreasonable." At the second trial in 2011, the jury again convicted appellant of second degree murder with the finding that he personally used a deadly weapon.

---

[2] All statutory references are to the Penal Code.

Appellant contends: (1) The prosecutor was collaterally estopped to argue this killing was premeditated and that the trial court erred when it permitted that argument; (2) The trial court erred when it gave instructions limiting his theories of perfect and imperfect self-defense and when it declined to instruct the jury on involuntary manslaughter and on a third theory of voluntary manslaughter; (3) The prosecutor committed misconduct in his closing arguments when he incorrectly defined the provocation required for heat of passion voluntary manslaughter; and (4) his Sixth Amendment confrontation rights were violated when a pathologist, who did not perform the autopsy, testified concerning the condition of Vasquez's body and the cause of his death. We affirm.

*Facts*

Eduardo Vasquez drove his car to the ampm market in Carpinteria about 11:30 p.m. on the night of May 15, 2000. Three of Vasquez's friends were in the car with him: Justin Rosenberger, Mark Covarrubias, and Manuel Ortega. Vasquez parked the car next to the gas pump island, so that the driver's side of the car was close to a concrete post guarding the pump island. The four men got out of the car and were standing around it when appellant walked out of the ampm market. Instead of walking around the car, appellant walked between it and the concrete post. In doing so, he physically bumped Vasquez and Rosenberger.

As appellant walked away from the group, Vasquez said to him, "What's your problem? You have the whole gas station to walk through, you know." Vasquez and Rosenberger exchanged profanities with appellant. Appellant threatened to kill them and said: "I have guns and knives, I'll be back." No one threatened to harm appellant. Then, appellant walked quickly away.

Vasquez, Rosenberger and Covarrubias went inside the market to buy snacks and cigarettes. Ortega stayed outside, standing near the front bumper of Vasquez's car. A few minutes later, appellant reappeared in the parking lot. Covarrubias, who had just left the market, was surprised to see appellant approaching him. Appellant looked agitated and ready to fight. He was concealing something in his right hand but neither Ortega nor Covarrubias could tell what it was. Ortega told him, "No problems here." Appellant replied, "Who's got the problem?" Covarrubias said he did not want any problems. Appellant responded with something like, "Where's your friend? Your friend have a problem?" It seemed to Covarrubias like appellant was looking for Vasquez. Covarrubias told him, "You should probably go. Don't want any trouble."

At that point, Vasquez and Rosenberger came out of the market. Appellant was standing about 15 feet away from Vasquez. When Vasquez saw appellant,

he tossed his hamburger to Ortega and said, "I'll handle this." Vasquez took a couple of steps toward appellant. He put his hands up near his face, with the palms out, as if to defend himself. He did not clench his fists. Appellant lunged forward and, in an overhand and downward swinging motion, stabbed appellant in the chest. He immediately jumped back and moved 10 or 12 feet away from Vasquez and said, "What are you going to do now, punk?" Vasquez did not reply. He looked at his friends and walked backwards a few steps. Vasquez's friends heard a woman say, "Matthew [(appellant's first name)], let's go." He got into the passenger seat of a white SUV and it drove off.

Vasquez told Rosenberger to take him to the hospital because he had been stabbed. He lost consciousness during the drive and was not responsive when they arrived at the hospital. He died as a result of the stab wound that penetrated six inches into his chest.

Appellant testified at the first trial. His testimony was read to the jury at his second trial. According to appellant, bumping into Vasquez and Rosenberger on his way out of the market was an accident. Vasquez immediately started yelling at appellant. "He was using profanity and the other three were yelling too. They joined in right behind him, came forward and started yelling at me too." Appellant left the parking lot as they yelled at him. Appellant was upset with himself because he had acted like a coward. He testified, "I wanted to go back and I wanted . . . to tell them, show them pretty much that I wasn't scared of them, that I wasn't a coward." He ran to his nearby apartment, retrieved a knife from his kitchen and then returned to the ampm parking lot.

Appellant testified that, when he got to the parking lot, he got to within six to 10 feet of Ortega and Covarrubias. He pulled the knife out of his pocket and said to them, " 'If you've got a problem with me do something about it now.' " Appellant intended to scare them. He believed they would not try to beat him up if he was holding the knife, but he had no intention of using the knife. "Then about five, five, 10 seconds later, [Vasquez] came out of the store. Somebody came behind him too. When he came out of the store and saw me he came at me. He came pretty fast towards me in my direction and he handed . . . one of his friends something that was in his hand, and he did say, 'I'll handle this.' He just came at me. He came all the way up to me. And I remember that it happened really fast, because he came at me really fast. And I did take one step towards him, and I—and I did stab with the knife, but it—it kind of—I turned my head and closed my eyes kind of when I did it and it felt like we kind of collided. And right as it happened, I turned and started to run from him . . . ." Appellant soon realized no one was following him, so he went back home.

On cross-examination, appellant agreed that he was the aggressor in his confrontation with Ortega and Covarrubias, but he denied asking them where their friend was. He also denied saying, during the first confrontation, that he would return with a gun and a knife to kill them. Appellant agreed that Vasquez and his friends did not have weapons in their hands and that no one hit him. No one threw anything at appellant. When he left the parking lot the first time, no one chased him.

Appellant explained, "I believe I did take a step when it happened, right as he ran into me, right as he came into me." Appellant denied that he intended to use the knife when he returned to the parking lot. However, he admitted that when Vasquez approached him, he "plunged" the knife into Vasquez's chest. "I didn't even thought [*sic*: think] . . . it just happened really fast. He just ran up to me. I wasn't thinking, oh, I want to stab this guy in the chest. That's not what I was thinking." Appellant had the knife "in the ready position," and then stabbed Vasquez. "I wasn't aiming specifically for his chest or anything, just kind of did it. Closed my eyes . . . . We just kind of ran into each other. I didn't really even see where I had stabbed him or anything." Appellant believed that, if he had not had the knife, Vasquez would have "started beating me up."

### Jury Instructions

The trial court instructed the jury on both express malice and implied malice second degree murder. In addition, the trial court instructed the jury on the lesser included offense of voluntary manslaughter on heat of passion and imperfect self-defense theories. The jury was also instructed on self-defense. No involuntary manslaughter instructions were given.

### Collateral Estoppel/Jeopardy

Appellant contends the prosecutor, in his closing arguments, improperly urged the jury to convict appellant of second degree murder on the theory that he planned or premeditated the killing. Because appellant was acquitted of first degree murder in his first trial, appellant contends that jeopardy principles collaterally estopped the prosecutor from making that argument. Appellant forfeited appellate review of this issue by failing to raise it in the trial court. (*People v. Memro* (1995) 11 Cal.4th 786, 821 [47 Cal.Rptr.2d 219, 905 P.2d 1305] [if double jeopardy claim is not affirmatively raised in the trial court, "any claim on that ground is not preserved for review."]; *People v. Morales* (2003) 112 Cal.App.4th 1176, 1185 [5 Cal.Rptr.3d 615].)

■ On the merits, we conclude the prosecutor's arguments did not violate collateral estoppel principles because appellant's acquittal at the first trial was

not a factual finding that he acted without planning or premeditation. Moreover, the jurors in appellant's second trial were never asked to decide whether the killing was premeditated. There was no relitigation of an issue necessarily decided in appellant's first trial.

■ The double jeopardy clause of the Fifth Amendment to the United States Constitution protects against a second prosecution for the same offense after an acquittal. (*North Carolina v. Pearce* (1969) 395 U.S. 711, 715 [23 L.Ed.2d 656, 89 S.Ct. 2072].) Collateral estoppel is one component of double jeopardy. (*Ashe v. Swenson* (1970) 397 U.S. 436, 445–446 [25 L.Ed.2d 469, 90 S.Ct. 1189].) As our Supreme Court has explained, "collateral estoppel bars relitigation of an issue decided at a previous trial 'if (1) the issue necessarily decided at the previous trial is identical to the one which is sought to be relitigated; if (2) the previous trial resulted in a final judgment on the merits; and if (3) the party against whom collateral estoppel is asserted was a party or in privity with a party at the prior trial.' ([*People v. Taylor* (1974) 12 Cal.3d 686,] 691 [117 Cal.Rptr. 70, 527 P.2d 622].)" (*People v. Lawley* (2002) 27 Cal.4th 102, 163 [115 Cal.Rptr.2d 614, 38 P.3d 461].) Appellant has the burden to establish the factual predicate for application of the doctrine. (*People v. Morales, supra*, 112 Cal.App.4th at p. 1187.) Specifically, appellant must "demonstrate that the issue whose relitigation he seeks to foreclose was actually decided in the first proceeding." (*Dowling v. United States* (1990) 493 U.S. 342, 350 [107 L.Ed.2d 708, 110 S.Ct. 668].)

Appellant focuses on several portions of the prosecutor's closing argument to support his contention that the prosecutor sought to relitigate the issue of whether he acted with premeditation and deliberation, requirements for a first degree murder conviction. At various times, while discussing the express malice form of second degree murder, the provocation required for voluntary manslaughter, and appellant's claim of imperfect self-defense, the prosecutor referenced the undisputed facts that appellant left the ampm market, retrieved a knife from his apartment, returned to the market, confronted the victim and stabbed him. The prosecutor argued these facts were sufficient to prove express or implied malice second degree murder, and that they foreclosed appellant's claims that he acted in the heat of passion or in imperfect self-defense.

■ Appellant contends these arguments invited the jury to convict him on the theory that he premeditated and deliberated the killing, a theory that, he contends, was foreclosed by his acquittal of first degree murder at the first trial. We disagree. The not guilty verdict at appellant's first trial shows only that the jury had a reasonable doubt as to his guilt on the degree of the murder. It does not amount to a factual finding that appellant did *not* premeditate or deliberate the killing. (*United States v. Watts* (1997) 519 U.S.

148, 155 [136 L.Ed.2d 554, 117 S.Ct. 633]; *Santamaria v. Horsley* (9th Cir. 1998) 133 F.3d 1242, 1246.) As the Supreme Court explained in *United States v. Watts*, " 'acquittal on criminal charges does not prove that the defendant is innocent; it merely proves the existence of a reasonable doubt as to his guilt.' *United States* v. *One Assortment of 89 Firearms* [(1984)] 465 U.S. 354, 361 [79 L.Ed.2d 361, 104 S.Ct. 1099]." (*United States v. Watts, supra,* 519 U.S. at p. 155.) Because "it is impossible to know exactly why a jury found a defendant not guilty on a certain charge," the jury "cannot be said to have 'necessarily rejected' any facts when it returns a general verdict of not guilty." (*Ibid.*) Consequently, the jury in appellant's first trial cannot be said to have "necessarily decided" that he did not factually plan to kill Vasquez. The prosecutor was not, therefore, collaterally estopped to argue that the evidence appellant returned to the ampm after retrieving the knife from his apartment was sufficient to prove he acted with express or implied malice and not in the heat of passion or in self-defense.

The second jury was correctly instructed on the express and implied malice forms of second degree murder. It received no instructions on premeditated and deliberate first degree murder and was never permitted to consider appellant's guilt of that offense. Among other things, it was informed that malice aforethought "is a mental state that must be formed before the act that causes death is committed. It does not require deliberation or the passage of any particular period of time." In light of this instruction, the prosecutor properly argued that appellant's conduct before the stabbing was evidence that he acted with malice aforethought.

The prosecutor did not argue that appellant committed a premeditated murder. Instead, he argued that appellant acted with express or implied malice. For example, the prosecutor stated: "[At] the time that [appellant] walked back to the AM/PM and confronted Eddie Vasquez and drove a knife deep into his chest, he did so intending to take his life. Not necessarily intending to stab him only or intending to cause a problem, but intending to cause his death by that action. That is express malice, and if you find that he intended to kill him walking back to the AM/PM, then you have established malice aforethought in its express form."

The prosecutor made similar comments when discussing the provocation required for voluntary manslaughter and the concept of a cooling off period. For example, the prosecutor argued that the victim's conduct and that of his friends did not amount to provocation that would "require or cause a person of average disposition to do anything rash, never mind go home, grab a knife and kill somebody." He later reiterated, "The provocation has to be such that a person of average disposition would have been provoked. Defendant goes home, he gets a knife, and he returns. He's about five minutes away before he

comes back, immediately goes up to the two men who are now outside[,] . . . he displays the knife, he challenges them to a fight, makes it very clear he has the knife." When those two men do not respond, appellant encounters the victim. No blows are exchanged before appellant stabs the victim. As the prosecutor argued, "Mr. Vasquez never made any contact whatsoever with [appellant]. [Appellant] wasn't injured in any way. He wasn't touched in any way. [Appellant] had the knife in his hand the entire time and this incident was over in seconds. [¶] Appellant came back to the AM/PM for purposes of killing someone, and that someone specifically was Eddie Vasquez. Provocation had nothing to do with it."

While addressing the concept of a cooling-off period, the prosecutor stated, "Well first of all, [appellant] was never hot. He was angry but he wasn't hot in that response. In the time he got home, and as he says in his own testimony in 2001, he made the decision to get a knife before he actually went into his apartment. He wasn't reacting to this intense provocation that had occurred which robbed him of his ability to think clearly. He was thinking clearly."

The prosecutor rebutted appellant's imperfect self-defense theory of voluntary manslaughter by arguing that appellant did not actually believe he was in imminent danger of death or great bodily injury. "He put himself in that situation. He created the danger that he then found himself in and he never found himself in any danger. It never crossed his mind that anybody was going to hurt him. He was the one armed with a knife and he came there intending to inflict injury, not to receive injury. He didn't go there on a kamikaze mission believing that he was going to get hurt. That's why he had the knife." The prosecutor later repeated the argument: "Self-defense may not be claimed by a defendant who willfully and without any necessity for his own protection creates a danger with which he is thereupon threatened. Isn't that exactly what we have? He goes home, he gets a knife, he's angry, he's upset, and so he goes back to confront the people who he thinks insulted him. He's looking to [exact] revenge. It has nothing to do with that kind of emotional response to provocation. This is pure revenge." These arguments do not ask the jury to find that appellant premeditated or deliberated the killing. Rather, they use the undisputed facts of that night to argue that appellant acted with malice aforethought and to rebut his claims that he acted in the heat of passion or in imperfect self defense.

■ An acquittal on first degree murder alters the legal, but not factual, landscape for retrial purposes on lesser offenses. Here, for example, it seems apparent that appellant went home to get a knife. He was thinking about getting a knife before he picked it up and returned to confront the victim. This is planning activity. A prosecutor may argue "planning" to show murder

in the first degree. (See, e.g., *People v. Anderson* (1968) 70 Cal.2d 15, 26 [73 Cal.Rptr. 550, 447 P.2d 942].) But such planning may also show express malice to prove second degree murder.

Appellant contends the trial court erred because it failed to give a sua sponte "preclusive" instruction forbidding the jury to base a guilty verdict "wholly or partially upon a finding that [appellant's] pre-homicide actions prove [appellant] then intended to kill and is therefore guilty of murder." The trial court had no such obligation. First, the proposed instruction is not a correct statement of the law. Second, the jury was not required to ignore evidence that appellant acted with express malice in his "pre-homicide actions."

We also reject the contention that appellant received ineffective assistance from his trial counsel. Counsel had no duty to object to the prosecutor's closing arguments or to request an instruction concerning the collateral estoppel effect of the verdict in appellant's first trial. The collateral estoppel argument was incorrect for the reasons we have already stated. Counsel was not ineffective for failing to raise an objection that lacked merit or to request an instruction that is an incorrect statement of the law. (*People v. Cudjo* (1993) 6 Cal.4th 585, 616 [25 Cal.Rptr.2d 390, 863 P.2d 635].)

[[/]]*

.  .  .  .  .  .  .  .  .  .  .  .  .  .  .  .  .  .  .  .  .  .  .  .  .  .  .  .  .  .  .  .  .  .  .  .  .  .  .

### Response to Federal Opinion

As indicated, the United States District Court for the Central District of California adopted the report and recommendation of a United States Magistrate Judge (hereafter, the federal opinion) granting appellant's petition for writ of habeas corpus. It vacated appellant's conviction because our harmless error analysis in the first appeal was "perfunctory" and "objectively unreasonable." We have an obligation to respond to the federal opinion. The comments made by Division Two nearly 40 years ago in *People v. Miller* (1978) 85 Cal.App.3d 194 [149 Cal.Rptr. 204] are apt. There, when confronted with a federal trial court order to show cause on a habeas corpus petition, the court said, "We consider the order by the federal district court to be an affront to the judges of the courts of this state." (*Id.* at p. 198.)

The present matter is worse. Here, there is a full opinion condemning the harmless error analysis as "perfunctory" and "objectively unreasonable."

---

*See footnote, *ante*, page 812.

The former statement is, at the very least, disrespectful, and raises the issue of integrity. The Court of Appeal has a " 'bounden duty to protect the integrity of [the] court.' [Citations.] 'However willing [the individual judge or justice] may be to forego the private injury [to reputation], the obligation is upon him by his oath to maintain the respect due to the court . . . .' " (*In re Ciraolo* (1969) 70 Cal.2d 389, 394–395 [74 Cal.Rptr. 865, 450 P.2d 241]; see *In re Buckley* (1973) 10 Cal.3d 237, 249 [110 Cal.Rptr. 121, 514 P.2d 1201].) We understand that the federal courts have the power and right to vacate state court final judgments. Having the power and right does not make it right. .

█ The California Court of Appeal is tasked with many duties. One of them is to follow our state's constitutional mandate to reverse a judgment if a miscarriage of justice has occurred. (Cal. Const., art. VI, § 13.) Any harmless error analysis involves both a legal and a factual appraisal. To some extent, the Court of Appeal is called upon to weigh the facts in deciding whether a conviction should be reversed. Such a factual determination of that question is apparently entitled to no weight in the central district. The federal opinion cited cases stating that the standard of review in a habeas corpus case is "highly deferential" and requires that a state court decision be "given the benefit of the doubt." (See *Lindh v. Murphy* (1997) 521 U.S. 320, 336 [138 L.Ed.2d 481, 117 S.Ct. 2059] *Woodford v. Visciotti* (2002) 537 U.S. 19, 24 [154 L.Ed.2d 27, 123 S.Ct. 357].) It does neither.

The original opinion stated that the trial court should not have instructed the jury that second degree murder is a general intent crime. It stated this error was harmless beyond a reasonable doubt, citing *Chapman v. California* (1967) 386 U.S. 18 [17 L.Ed.2d 705, 87 S.Ct. 824], as well as two controlling California Supreme Court opinions and one California Court of Appeal opinion, to support our legal and factual determination that any deficiency in the trial court's instructions to the jury was harmless. (*People v. Swain* (1996) 12 Cal.4th 593, 601–603 [49 Cal.Rptr.2d 390, 909 P.2d 994]; *People v. Nieto Benitez* (1992) 4 Cal.4th 91, 102–103 [13 Cal.Rptr.2d 864, 840 P.2d 969]; *People v. Lyons* (1991) 235 Cal.App.3d 1456, 1462 [1 Cal.Rptr.2d 763].)

In reaching this ruling, the original opinion did not denigrate the instructional phase of a trial. It seemed obvious, however, that in this fact-specific case, no amount of jury instruction would change the basic facts or alter their legal significance. After the initial confrontation, appellant announced he would be back to kill the victim and his companions with guns or knives. He went home, armed himself with a knife, and returned. He confronted the victim's companions. The victim came out of the store. Consistent with appellant's earlier announced intention of killing someone, he fatally stabbed the unarmed victim in the chest. This sounds like murder. The objective reader will make up his or her own mind. Given these stark facts, the trial

court's single and erroneous use of the legal term of art, "general criminal intent," could not have adversely affected the jury's deliberations or verdict. Thus, the original opinion concluded the instructional error was harmless beyond a reasonable doubt.

To grant the writ of habeas corpus, by contrast, the federal opinion had to adopt a factual premise that even it characterized as "implausible." Adopting one version of the defense theory at trial, the federal opinion concluded it was possible the victim "inflicted the mortal wound on himself as he charged Petitioner, who was holding the knife in his outstretched arm." Based on the totality of facts and circumstances, and the reasonable inferences that can be drawn from them, we would go even farther. The defense theory was not just "implausible," it was preposterous. This scenario would not even work if the victim was Jesse Owens reincarnate, sprinting toward appellant with his chest jutting out, so that a stationary kitchen knife could penetrate six inches into his thoracic cavity and heart.

The implausibility of the defense theory lead us to the original and terse harmless error analysis. In theory, any legal analysis by any court could be longer. Here it was unnecessary. The original opinion's treatment of appellant's contentions was not "perfunctory." This word is defined as: "done or acting routinely and with little interest or care." (American Heritage Dict. (2d college ed. 1982) p. 922.) The original opinion was not routinely written with little interest or care.

Apart from the " 'bounden duty to protect [and defend] the integrity of [the] court,' " (*In re Ciraolo, supra*, 70 Cal.2d 389, 394) there is another reason why this response is appropriate. The questioned harmless error analysis is not an aberration in the Second Appellate District. It is a typical analysis and thus, the issue transcends the present matter. If the former harmless error analysis was faulty, other similar analyses from our court are also vulnerable to successful collateral attack in the central district. We hope that is not the case.

Finally we disagree with the federal opinion's conclusion that the harmless error analysis was "objectively unreasonable." Based upon the facts, circumstances, and the reasonable inferences which flow therefrom, the objective reader will make up his or her own mind. Nothing in *Ho v. Carey* (9th Cir. 2003) 332 F.3d 587 or *Inthavong v. Lamarque* (9th Cir. 2005) 420 F.3d 1055, 1059 compelled the grant of habeas corpus relief and the vacation of the original murder conviction. To the extent that these cases stand for the proposition that habeas corpus relief is required as a matter of law, they work as a judicial repeal of the Antiterrorism and Effective Death Penalty Act of 1996 (Pub.L. No. 104-132 (Apr. 24, 1996) 110 Stat. 1214). "This situation . . .

is a good example of why the criminal justice system is so often criticized for failing to achieve certainty and finality in its judgments." (*People v. Miller, supra*, 85 Cal.App.3d at p. 199.) Appellant was fairly tried and fairly convicted; both times.

### Conclusion

The judgment is affirmed.

Gilbert, P. J., and Perren, J., concurred.

A petition for a rehearing was denied May 19, 2014, and appellant's petition for review by the Supreme Court was denied July 23, 2014, S218164.